IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

ALFRED J. CAMPBELL,                )
                                   )
     Plaintiff,                    )
                                   )
v.                                 )      No. <u>07-2475 T/P</u>
                                   )
MICHAEL J. ASTRUE,                 )
COMMISSIONER OF SOCIAL             )
SECURITY,                          )
                                   )
     Defendant.                    )

---

## REPORT AND RECOMMENDATION

---

Plaintiff Alfred J. Campbell appeals from a final decision of the Commissioner of Social Security (the "Commissioner") finding that Campbell's disability ceased as of July 31, 2003, and that his period of disability and Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 <u>et seq.</u>, ended in September of 2003. The appeal was referred to the United States Magistrate Judge for a report and recommendation. Based on the entire record in this case, the court proposes the following findings of fact and conclusions of law and recommends that the Commissioner's decision be remanded for further proceedings consistent with this report and recommendation.

## I.  PROPOSED FINDINGS OF FACT

Campbell filed his application for SSI benefits on February

16, 2001.  (R. at 71-73).  He alleged a disability onset date of January 24, 2001, citing stomach cancer.  (R. at 95).  On April 20, 2001, the Social Security Administration ("SSA") determined that Campbell was disabled as of February 1, 2001, due to malignant neoplasm of the stomach and weakness.  (R. at 34).

On July 14, 2003, the SSA provided Campbell with a Notice of Disability Cessation, which stated that a review of his case revealed that his health had improved, he was able to return to work, and that his benefits would cease in September of 2003.  (R. at 38-39).  Campbell subsequently filed a request for reconsideration of his disability cessation, and a hearing before Disability Hearing Officer Kay Patterson was held on April 6, 2004. (R. at 44-48).  Patterson issued a decision on August 6, 2004, finding that Campbell was no longer disabled.  (Id.).  At Campbell's request, a hearing was held before Administrative Law Judge ("ALJ") Sheldon P. Zisook, on October 12, 2005, in Memphis, Tennessee.  (R. at 306-34).  ALJ Zisook issued a written decision on May 10, 2006, denying Campbell's claim and finding that he was no longer disabled or entitled to benefits.  (R. at 11-22).  After the Appeals Council denied his request for review, (R. at 5-8), Campbell filed the instant appeal in the Western District of Tennessee.

## A.   Prior Medical History

Campbell was born on February 3, 1951.  (R. at 71).  He is

5'9" tall and weighs 158 pounds. (R. at 133). He has been married twice and divorced twice and has nine children and fourteen grandchildren. (R. at 71, 153, 204). He was incarcerated from 1997 until 2002 for a drug trafficking conviction. (R. at 204). He lives with his adult son. (R. at 313).

Campbell was admitted to Baptist Memorial Hospital ("Baptist") on September 23, 1998, and was diagnosed with questionable acute cholecystitis. (R. at 297). He had previously been treated for H. Pylori, and for the prior three to four days had been experiencing nausea, vomiting, and epigastric pain radiating to his lower abdomen. (Id.). On September 24, an endoscopy procedure revealed severe erosive esophagitis and a gastric ulcer. (R. at 256).

On October 5, 1998, Campbell was treated at Delta Gastroenterology ("Delta") for peptic ulcer-like symptoms. (R. at 292). He had lost weight and was experiencing abdominal pain as well as symptoms of bowel obstructions. (Id.). An endoscopy revealed a gastric carcinoma. (Id.). On October 9, 1998, a computed tomography ("CT") scan of Campbell's abdomen showed minimal circumferential thickening of the distal esophagus four centimeters proximal to the rectal gastrointestinal junction. (R. at 255). Additionally, the stomach was not distended, there were no perigastric masses, and the fat around the stomach appeared normal. (Id.). The liver, spleen, pancreas, adrenal glands, and kidneys also appeared normal, although there was a five millimeter

cyst in the right kidney. (Id.). A CT of Campbell's pelvis showed calcification in the distal abdominal aorta, no masses or ascites, and no adenopathy. (Id.). Campbell was diagnosed with possible circumferential thickening of the distal esophagus, no evidence of metastatic disease, and atherosclerotic vascular disease. (Id.).

Campbell was admitted to Methodist Hospital ("Methodist") from November 6, 1998, until November 14, 1998, for stomach cancer treatment. (R. at 302). He was incarcerated at the time of hospitalization. (R. at 143). A subtotal gastrectomy with Billroth II anastomosis was performed. (R. at 302). The pathology report showed superficially invasive adenocarcinoma, moderately to poorly differentiated with two out of five lymph nodes from the lesser curvature with metastatic adenocarcinoma, pathological stage. (R. at 303). An esophagogastroduodenoscopy revealed gastric cancer of the distal stomach. (R. at 302). Additionally, Campbell had lost between ten and fifteen pounds. (Id.).

On November 8, 1998, a pathology report of biopsies from Campbell's stomach and omentum showed superficially invasive adenocarcinoma, moderately to poorly differentiated. (R. at 254). Additionally, the carcinoma extended into the superficial muscularis externa, and the proximal and distal resection margins were free of tumor. (Id.). Two out of five lymph nodes from the lesser curvature contained small foci of metastatic adenocarcinoma in the subscapsular sinuses, and two lymph nodes from the greater

-4-

curvature were negative for metastatic carcinoma.  (<u>Id.</u>).

On November 11, 1998, an x-ray of Campbell's abdomen showed mild ileus and free air under the right hemidiaphragm, probably as a result of postoperative changes.  (R. at 301).  A chest x-ray taken the same day showed normal results.  (<u>Id.</u>).  Overall, Campbell recovered well, with several episodes of self-resolving abdominal pain and mild ileus noted by a kidney, ureter, and bladder series on November 10.  (R. at 143).  Upon discharge, Campbell was tolerating a normal diet and having normal bowel movements.  (<u>Id.</u>).  He was taking Percocet and Pepcid.  (<u>Id.</u>).

Campbell was admitted to Methodist from November 25, 1998, until December 3, 1998.  (R. at 145).  He was experiencing epigastric and diffuse pain, nausea, vomiting, and abdominal pain. (<u>Id.</u>).  At the time, he was taking Doxepin, Pepcid, and Percocet. (<u>Id.</u>).  His physical examination showed that his abdomen was slightly distended, his bowel sounds were hyperactive, and he had left-sided tenderness with no guarding or rebound.  (R. at 146). A kidney, ureter, and bladder series was unremarkable.  (<u>Id.</u>).  A nasogastric tube was inserted upon admission, which improved Campbell's abdominal distention.  (<u>Id.</u>).  On November 27, 1998, abdominal x-rays showed a loop of air causing a distended small bowel in the left upper quadrant and colon gas.  (R. at 298). Comparison with the November 11 x-ray showed a decrease in the amount of air present.  (<u>Id.</u>).  He was started on total parenteral

nutrition on November 26 until he began to tolerate a clear liquid diet on November 30. (Id.). He was advanced to a full liquid diet on December 1 and a regular postgastrectomy diet on December 2. (Id.). His nausea improved, and he tolerated the diet without any vomiting. (Id.). Upon discharge, Campbell was instructed to be on a regular post-gastrectomy diet and to continue on his medications. (R. at 147).

Campbell was admitted to Methodist from December 11, 1998, until December 15, 1998, for small bowel obstruction. (R. at 293). He had been experiencing abdominal pain, nausea, and vomiting. (Id.). A physical examination showed that Campbell's abdomen had decreased breath sounds, was distended, had mild diffuse tenderness, and a well-healed midline scar was present. (R. at 294). His abdomen was tender with no masses. (Id.). The hospital treatment included insertion of a nasogastric tube and administration of intravenous fluids until a return of bowel function and his abdominal distention cleared. (Id.). Campbell was advanced from liquids to a regular diet, which he tolerated without difficulty. (R. at 148).

On January 6, 1999, Campbell was seen at Delta. (R. at 291). He was "doing extremely well and [had] no symptoms." (Id.). It was noted that Campbell should be referred to a medical oncologist for possible adjuvant therapy. (Id.). On March 5, 1999, Campbell returned to Delta for another follow up appointment. (Id.). He

continued to do well and gained weight, although he had one episode of rectal bleeding.  (<u>Id.</u>).

On February 16, 2001, Campbell completed a Disability Report. (R. at 94-103).  He stated that he suffered from stomach cancer that required the removal of 75% of his stomach.  (R. at 95).  He stated that his cancer limited his ability to work because he became very weak and he could not lift heavy objects or stand for prolonged periods of time.  (<u>Id.</u>).  He also reported that his cancer caused pain and had first bothered him in October of 1998. (<u>Id.</u>).  Campbell stated that he first became unable to work as of January 24, 2001, but he had stopped working on March 11, 1998 when he was fired due to a failed urine drug test and his incarceration. (<u>Id.</u>).  Campbell completed his GED in February of 2000, and he had not received any special job training or attended trade or vocational school.  (R. at 101).

Shortly after his release from prison, on March 19, 2001, Campbell was seen by Dr. Raza Dilawari.  (R. at 283).  He had not undergone radiation or chemotherapy. (<u>Id.</u>).  Campbell stated that an electrocardiogram and a CT scan in November or December of 2001 revealed two ulcers in his stomach.  (<u>Id.</u>).  He complained of chronic reflux since his surgery, and he was not able to lie back at night without feeling the urge to vomit.  (<u>Id.</u>).  He had experienced multiple episodes of emesis, which occurred two to three times a month.  (<u>Id.</u>).  He was unable to eat large meals, and

he was not on any medication. (Id.). Physical examination showed that his abdomen was soft and non-tender and his scar was well-healed. (Id.). The diagnostic impression was status post subtotal gastrectomy with Billroth II procedure for gastric adenocarcinoma, chronic reflux, and reported history of gastric ulcers. (Id.).

On May 7, 2001, Campbell sought treatment at the Health Loop for gastrointestinal symptoms. (R. at 223). On November 7, 2001, Campbell sought treatment at the Health Loop for hematochezia (bloody stools) and diarrhea after eating. (R. at 222). Otherwise, his appetite was good and his weight was stable. (Id.). The treatment notes stated that Campbell was receiving disability payments at the time and that he was active during the day. (Id.). Additionally, it was noted that a colonoscopy was needed to evaluate the hematochezia. (Id.). On November 21, 2001, Campbell sought treatment at the Health Loop for insomnia. (R. at 221).

Campbell was reevaluated for gastric cancer, dyspepsia, and hematochezia at Delta on December 12, 2001. (R. at 167). He had a normal physical examination, and the diagnostic impression was hematochezia, rule out colon cancer. (Id.). A colonscopy was ordered. (Id.). CT scans of Campbell's abdomen and pelvis taken on December 16, 2001, showed no abnormality or pathology. (R. at 158).

On December 20, 2001, a colonoscopy was performed at Delta. (R. at 175). His cecum and ascending colon showed normal mucosa,

his transverse colon showed scattered diverticular disease, and his descending colon showed diminutive adenomatous polyps, which were removed via cautery. (<u>Id.</u>). Campbell was diagnosed with colon polyps status post polypectomy by cautery, moderate severe diverticular disease, and hemorrhoids. (R. at 176). Analysis of a tissue sample from the descending colon showed a hyperplastic colon polyp. (R. at 174).

Campbell was admitted to Methodist from December 26, 2001, until December 27, 2001, for hematochezia, abdominal pain, nausea and vomiting, weakness, and rectal bleeding. (R. at 150, 152, 160-61). Campbell's abdominal pain was diffuse, crampy, and was not relieved by his medication. (R. at 152). He was not taking his prescribed medications at the time. (<u>Id.</u>). His physical examination was normal except that his abdomen was soft with mild diffuse tenderness without rebound. (R. at 153). X-rays of his abdomen showed no abnormalities. (R. at 158). CT scans of the abdomen and pelvis revealed no pathology. (R. at 153). The diagnostic impression was nausea and vomiting, history of stomach cancer, history of peptic ulcer disease, and history of hemorrhoids. (R. at 154). He was given rectal suppositories for hemorrhoids. (R. at 152). He was also treated with intravenous fluids, Pepcid, and serial hematocrits. (R. at 150). His condition rapidly improved, and his diet was advanced before discharge. (<u>Id.</u>).

On December 27, 2001, a gallbladder ultrasound was performed to assess Campbell's abdominal pain. (R. at 173). The findings were acoustical densities within the gallbladder consistent with small gallstones, and no other abnormalities were identified. (Id.). The diagnostic impression was cholelithiasis. (Id.). An x-ray showed no abnormalities aside from a tiny, nonspecific calcification in the pelvis that may have been pheboliths representing vascular calcifications. (R. at 155).

On January 16, 2002, Campbell sought treatment for nausea, vomiting, diarrhea, and gallbladder ultrasound positive for gallstones. (R. at 166). His physical examination was normal, and he was diagnosed with nausea and vomiting with history of gastric surgery, rule out gastrectomy syndrome versus cholelithiasis. (Id.). On January 22, 2002, a gastrointestinal endoscopy and biopsy were performed at Delta to assess Campbell's nausea and vomiting. (R. at 172, 290). It revealed mild esophagitis with bilious material, erythematous mucosa without ulceration in his stomach, and normal mucosa in his duodenum. (Id.). He was diagnosed with esophagitis and gastritis. (Id.). A tissue sample from Campbell's stomach revealed florid reactive foveolar cell hyperplasia with edema of lamina propria and minimal inflammation consistent with a phase of acute erosive gastritis. (R. at 171). The sample was negative for H. pylori, there was histologically normal duodenal mucosa, and no malignancy was identified. (Id.).

On March 3, 2002, Campbell sought treatment at Delta for abdominal pain with nausea and vomiting, diarrhea, nocturnal symptoms, and weight loss. (R. at 165). His abdomen was tender in the right upper quadrant with guarding without rebound, no masses or hepatosplenomegaly. (Id.). The diagnostic impression was nausea and vomiting with history of gastric surgery, positive gallstones, and weight loss. (Id.).

On June 12, 2002, Campbell was treated at the Health Loop for chest pains and insomnia. (R. at 218). On June 21, 2002, Campbell sought treatment at the Health Loop for episodes of nocturnal awakenings with squeezing pains in the left side of his chest lasting for two months. (Id.). He was also experiencing insomnia due to nervousness. (Id.). The treatment notes recommended further evaluation to determine whether his symptoms were anxiety-related. (Id.).

On August 17, 2002, CT scans of Campbell's abdomen and pelvis were performed to assess his abdominal pain. (R. at 169). The findings were partial gastric resection with suture material along the anterior gastric wall, non-distended stomach, air fluid level present, and mildly distended small bowel loops more pronounced in the superior abdomen, less pronounced in the inferior abdomen with air fluid levels present. (Id.). Additionally, there was gas throughout most of the colon to the level of the rectum, a few scattered periaortic and mesenteric lymph nodes with little

apparent change since January of 2002, no sign of liver tumor, and the pancreas, adrenal glands, and kidneys appeared normal. (Id.). There was no hydronephrosis, but there was a cyst in the posterior right kidney that had not changed since the prior scan. (Id.). The diagnostic opinion was mechanical small bowel obstruction versus small bowel ileus, more pronounced proximally, definite transition point not identified, five to ten centimeter periaortic and mesenteric lymph nodes with similar appearance to January of 2002 CT scans, and cholelithiasis. (Id.).

On September 11, 2002, Campbell sought treatment at Delta for abdominal pain in the right upper quadrant, nausea, vomiting that worsened with eating, and gallstones. (R. at 164). Campbell's abdomen was tender in the right upper quadrant with guarding and without rebound, and no masses or hepatosplenomegaly were present. (Id.).

On September 18, 2002, Campbell was seen by Dr. Dilawari for gallstones and acid reflux. (R. at 289). On September 27, 2002, a CT scan of Campbell's abdomen and pelvis was performed at Methodist. (R. at 287). It showed no evidence of residual tumor or adenopathy. (Id.). Dr. Dilawari noted that Campbell's condition was probably alkaline reflux gastritis. (R. at 285). He stated that Campbell did have gallstones but that his symptoms were probably not related to them. (Id.).

On September 30, 2002, Campbell was seen at Delta for diarrhea

caused by his medication and four to five bowel movements per day.
(R. at 163). His physical examination was normal, and he was
diagnosed with gastroesophageal reflux disease ("GERD"). (Id.).
The treatment notes state that his GERD improved with Aciphex but
that Aciphex caused Campbell to have diarrhea. (R. at 164). On
October 7, 2002, an endoscopy showed significant bilious material
in the esophagus and stomach with some superficial ulcerations.
(R. at 285). He was diagnosed with alkaline reflux gastritis,
gallstones, and he was treated with Cholestyramine and Carafate.
(Id.).

Campbell was admitted to Methodist from December 2, 2002,
until December 6, 2002, for abdominal pain. (R. at 277). He had
been experiencing nausea after eating and sudden onset of sharp
pain in the right upper quadrant. (R. at 177). Although he denied
any alcohol, tobacco, or drug use, his urine screen was positive
for cocaine. (R. at 278). Physical examination showed that his
abdomen was soft with a well-healed midline surgical incision
without nodules or hernia, positive bowel sounds, and extreme
tenderness to light palpation throughout with no peritoneal signs.
(Id.). Otherwise, his systems were normal. (Id.). Campbell was
treated with intravenous fluids, multivitamins, Folate, Vitamin
B12, and Cipro 400 mg. (R. at 278-79). He did not have any
complaints as of December 3, but his total bilirubin had risen from
an elevated level of 1.9 to 6.3, his alkaline phosphatase was 161,

his asparate transaminase was 225, his alanine transferase was 377, his amylase was 100, his protime was 15.3, his international normalized ratio was 1.3, his partial thromboplastin time was 27.2, and his white blood cell count was 8.1. (R. at 279). An abdominal ultrasound showed a dilated gallbladder, no common bile duct dilation, and sludge in the gallbladder lumen, although no stones were visible. (Id.).

On December 2, 2002, CTs of Campbell's pelvis and abdomen showed that his gallbladder was enlarged and that pericholecystic fluid was present. (R. at 282). His common bile duct was enlarged, and mild intrahepatic ductal dilation was present. (Id.). His spleen appeared normal, but there were cysts in his right kidney. (Id.). Campbell's stomach had a post-operative appearance with hyperdense suture material separating the stomach from the left lobe of the liver. (Id.). His bowel gas pattern was nonobstructive, and there was no discrete adenopathy. (Id.). In addition, his bowel loops and bladder appeared normal. (Id.). The diagnostic impression was dilated common bile duct with pericholecystic fluid and intrahepatic ductal dilation, postoperative appearance to stomach, and right renal cyst. (R. at 283).

On December 3, 2002, an abdominal ultrasound was performed. (R. at 275). It showed that Campbell's liver parenchyma was normal, there was no evidence of liver mass, but there was slight

intrahepatic bile duct dilation and the common bile duct was slightly dilated. (Id.). Additionally, the gallbladder was in the upper limits of normal size and contained a small amount of sludge, but no gallstones were identified. (Id.). There was no evidence of cystic renal mass or hydronephrosis, and the spleen was normal. (Id.). The diagnostic opinion was mild dilation of the common bile duct and intrahepatic bile ducts that raised the possibility of common bile duct obstruction. (Id.).

On the day of discharge, liver function tests continued to show improvement with a decrease in Campbell's total bilirubin to a normal level of 0.6, his alkaline phosphorus was 104, his asparate transaminase was 23, his alanine transferase was 105, and his white blood cell count was 4.7. (R. at 279-80). Campbell was tolerating a regular diet, voiding ad lib, and had no complaints of abdominal pain, nausea, or vomiting. (R. at 280). Physical examination showed that his abdomen was soft, nontender, nondistended, and without evidence of rebound or tenial signs. (Id.). He was discharged with instructions to take no aspirin or nonsteriodal anti-inflammatory drugs and to be readmitted on December 8 for surgery on December 9. (Id.). An open cholecystectomy with intraoperative cholangiogram and possible common bile duct exploration, possible small bowel resection, possible excision of mass, and placement of biliary drain were scheduled. (R. at 280-81).

On December 9, 2002, an open cholecystectomy with intraoperative cholangiogram, secondary to cholelithiasis, was performed at Methodist. (R. at 272). Campbell was positive for cocaine on admission, and he was diagnosed with jaundice. (R. at 183). The procedure showed that his liver and peritoneum were normal. (R. at 273). There were no nodes in the porta hepatis, the common bile duct appeared normal in size without evidence of extrinsic compression, and "[t]here was no evidence of any recurrence from his gastric cancer." (Id.). The cystic duct was somewhat dilated. (Id.). There was no evidence of filling defects. (Id.). His gallbladder was removed. (R. at 184). He was diagnosed with mild chronic cholecystitis and cholelithiasis, and there was no evidence of neoplasm. (Id.). After the operation, Campbell complained of muscle spasms in his abdomen that were relieved with Flexeril. (Id.). Upon discharge on December 12, Campbell was instructed to ambulate ad lib, not to lift any weight over ten pounds for the next six weeks, and to consume a regular diet as tolerated. (R. at 185).

On December 20, 2002, Campbell completed a Report of Continuing Disability Interview. (R. at 105-114). He stated that his condition had changed since his original disability report and that his bile ducts were blocked and bile reflux was coming up through his nose. (R. at 105). Additionally, his gallbladder had been removed. (Id.). He stated that he did not feel that he could

return to work, although his doctor had not told him he could not work. (<u>Id.</u>). Campbell reported that Dr. Edibaldo Silva had restricted him from heavy lifting, driving, and strenuous exercise. (R. at 108). He stated that he was not able to get around on his own due to his recent surgery. (<u>Id.</u>). He stated that he could dress and bathe himself with no problems. (<u>Id.</u>). Campbell also stated that he could cook, clean, and do his own shopping. (R. at 109). His activities included watching television, reading the Koran and the newspaper, and playing dominoes. (<u>Id.</u>). Campbell stated that his children visited him and that he occasionally visited his grandchildren. (<u>Id.</u>). He also stated that he could drive, although his doctor had restricted him from driving. (<u>Id.</u>). The disability examiner observed that Campbell had difficulty sitting, he walked very gingerly due to his recent gallbladder surgery, he experienced sharp pains in his stomach area that caused him to jerk slightly in his chair, and he looked tired but was able to answer questions. (R. at 113). Campbell had driven himself to the interview. (<u>Id.</u>).

On December 20, 2002, Campbell was seen by Dr. Silva at Memphis Surgical Specialists for a post-operative follow-up. (R. at 271). Physical examination showed that Campbell had a well-healed, right subcostal wound with no evidence of cellulitis or infection. (<u>Id.</u>). He was not experiencing nausea or vomiting, although he complained of some discomfort in the incision and was

given Percocet.  (<u>Id.</u>).  By his January 24, 2003, follow up, Campbell had resumed normal activities with no limitations, he was eating well without any nausea or vomiting, and he denied any difficulty with pain.  (<u>Id.</u>).  Dr. Silva found that Campbell could resume his normal activities and an exercise routine.  (<u>Id.</u>).  Additionally, he could eat with no limitations, and he was urged to refrain from illicit drug use while taking his medications.  (<u>Id.</u>).

On January 14, 2003, Campbell completed a Pain Questionnaire.  (R. at 115-18).  He stated that his pain began in November of 1998 and was located in his abdomen.  (R. at 115).  His pain had not changed or spread, and it usually occurred every other day.  (<u>Id.</u>).  He stated that it was brought on by eating, lasted several hours, and was sometimes constant.  (<u>Id.</u>).  He stated that he took Tylenol every four hours and Percocet every six hours when his pain occurred.  (<u>Id.</u>).  He stated that his medication relieved his pain for two to three days and that the side effects included diarrhea, drowsiness, and itching.  (<u>Id.</u>).  Campbell also stated that he meditates and sleeps to relieve his pain.  (R. at 116).  He stated that his pain had changed his activities because he used to be motivated and aggressive, but now he is "slowed down."  (<u>Id.</u>).  He said that he sometimes cannot hold his bowels and he vomits often when he gets "highly motivated."  (<u>Id.</u>).  His daily activities included driving, shopping, reading, praying, walking, making the bed, washing dishes, and cooking.  (<u>Id.</u>).  He stated that he wished

the pain "would stop forever" but due to his surgeries, he felt as though he would have to "live with his pain for some time." (Id.).

On January 24, 2003, Campbell saw Dr. Silva for an examination of his surgical incision. (R. at 271). He had resumed normal activities and was eating well. (Id.). On March 24, 2003, Campbell was seen for cramping and very loose stool. (R. at 270). He was instructed to take Immodium and to change to a bland diet. (Id.). The clinical notes stated that Campbell became angry and stated that he wanted a new doctor. (Id.). On May 14, 2003, Campbell went to the Health Loop for his annual examination. (R. at 214). The findings were benign, although he had skin blisters on his feet and was suffering from insomnia. (Id.).

Campbell was admitted to Methodist from May 17, 2003, until May 18, 2003. (R. at 193). He was experiencing nausea, vomiting, and abdominal pain, and he had not had a bowel movement in three days. (Id.). He was diagnosed with small bowel obstruction. (Id.). Physical examination showed that his abdomen was protuberant, moderately tender, there was no rebound tenderness, and there were increased pitch bowel sounds. (Id.). He was admitted with a nasogastric tube in place and intravenous fluids were given. (Id.). The next morning, his abdominal distention had resolved and he was passing gas. (Id.). Campbell removed the nasogastric tube himself and demanded that he be permitted to leave. (Id.). He was discharged against medical advice. (Id.).

On June 26, 2003, Campbell was seen at the West Clinic for elevated prostate-specific antigen ("PSA") levels. (R. at 203). He was experiencing chronic abdominal pain, decreased energy, occasional diarrhea, and urinary hesitancy and frequency. (Id.). He also suffered from chronic pain syndrome secondary to abdominal discomfort from his previous surgeries. (Id.). He was taking Valium. (Id.). Campbell stated that he felt relatively well. (Id.). Campbell stated that he smoked three quarters of a pack of cigarettes per day, used cocaine on occasion, and drank six beers per day. (Id.). His hobbies included fishing and exercising. (Id.). Physical examination showed that his abdomen was soft, nontender, nondistended, and had normoactive bowel sounds. (Id.). There was no costovertebral angle tenderness, no palpable liver or spleen, and no abdominal masses. (Id.). There was no nodularity on prostate examination. (Id.). Campbell's PSA was elevated to thirteen. (Id.). He was referred to a urologist. (Id.). On July 30, 2003, Campbell was seen at the West Clinic for an elevated prostate specific antigen ("PSA") reading. (R. at 230). In addition, he was experiencing his "usual chronic abdominal pain that [had] not gotten any worse." (Id.). His physical examination was normal. (Id.).

On July 30, 2003, Campbell completed a Reconsideration Report for Disability Cessation. (R. at 127-34). He stated that his disabling condition was stomach cancer and that he had developed

prostate cancer.  (R. at 127).  He also stated that he had lost five pounds in the past two weeks.  (R. at 133).  He reported problems with personal mobility due to left leg pain.  (R. at 130). He said he could take care of his personal needs and grooming, he cooked once a week, went to the grocery store twice a month, read the Koran, prayed five times a day, visited his mother and other relatives, and drove himself.  (Id.).  On August 14, 2002, Campbell completed a Disability Report - Appeal.  (R. at 136-42).  He was not taking any medications at that time and stated that he could barely care for his personal needs.  (R. at 139-40).

On September 24, 2003, Campbell had a nuclear medicine bone scan for history of prostate cancer at the Regional Medical Center at Memphis ("the Med").  (R. at 235).  The findings showed no evidence of metastatic disease.  (Id.).  On October 16, 2003, Campbell was treated at the West Clinic for a recent diagnosis of prostate adenocarcinoma.  (R. at 248).  His physical examination was normal, and surgery was recommended.  (Id.).  A recent biopsy had confirmed adenocarcinoma in the left side of his prostate with a Gleason Score of six.  (Id.).

On December 23, 2003, an ultrasound of Campbell's right leg was performed due to his complaints of right leg swelling and pain. (R. at 234).  The results showed normal blood flow and normal compressibility.  (Id.).  The examination was negative for deep vein thrombosis.  (Id.).  On January 7, 2004, he was seen at the

West Clinic again after a radical prostatectomy. (R. at 247). His physical examination was normal at that time. (Id.).

On March 9, 2004, Campbell was treated at the Health Loop for bronchitis and sinusitis. (R. at 239). On March 10, 2004, he sought treatment for chest pain, coughing, diarrhea, headaches, weakness, and insomnia. (R. at 237-38). On March 26, 2004, Campbell was treated by Dr. Silva for persistent diarrhea that occurred shortly after eating. (R. at 268). He was not experiencing abdominal pain, but his diarrhea was debilitating. (Id.). Campbell's physical examination was unremarkable, and there was no evidence of recurrent disease. (Id.). Dr. Silva found that Campbell's symptoms were consistent with bile-induced diarrhea secondary to the cholecystectomy, and he placed Campbell on a regimen of Colestid. (Id.).

On April 13, 2004, Campbell had his annual examination at the Health Loop. (R. at 236). He was experiencing episodes of shortness of breath on exertion, but the examination findings were benign. (Id.). His shortness of breath was likely due to deconditioning, he was directed to restart exercise therapy, and he was prescribed Valium for insomnia. (Id.).

On February 17, 2005, Dr. Duncan at Delta performed a esophagastroduodenoscopy. (R. at 269). The results showed that Campbell's oropharynx, esophagus, esophagogastric junction, stomach, and duodenum were normal. (Id.). The diagnostic

impression was gastritis, gastroesophageal reflux disease, acute
erosive gastritis, and candidal esophagitis. (Id.).

On April 18, 2005, Campbell was treated by Dr. Silva for
symptoms of reflux that woke him from sleep at night. (R. at 268).
Campbell stated that for the past two weeks he had been
experiencing a bitter taste in his mouth and that his oropharynx
felt irritated. (Id.). He has also been suffering from diarrhea.
(Id.). Dr. Silva found that Campbell was likely experiencing
alkaline reflux, and he treated Campbell with Carafate. (Id.).

On July 18, 2005, Campbell sought treatment for severe nausea
and vomiting that was causing bile emesis to the point of dry
heaving, chronic diarrhea, and chronic abdominal pain. (R. at
266). Campbell also complained of numbness in his right leg.
(Id.). He stated that he could eat small amounts and that he had
not gained or lost weight. (Id.). He was diagnosed with GERD and
gastritis. (Id.). Dr. Dilawari explained to Campbell that the
rest of his stomach should be removed and his colon should be
rerouted to his esophagus, and the treatment notes stated, "We will
have to perform a total gastrectomy with Roux-en-Y." (Id.).
Physical examination was normal except for mid epigastric pain on
palpation and some numbness in the right leg. (Id.).

Campbell was admitted to Methodist from October 27, 2005,
until November 4, 2005, for an exploratory laparotomy with lysis of
adhesions, repair of hiatal hernia, and Nissen fundoplication. (R.

at 257).  The preoperative plan was to explore and possibly do a total gastrectomy.  (R. at 264).  The findings were a large esophageal hiatal hernia and no evidence of cancer.  (R. at 263). There was also a small mesenteric opening in the colon, which was closed during surgery.  (R. at 264).  On October 31, 2005, abdominal x-rays revealed a gas-filled colon as well as air in multiple small bowel loops that most likely represented adynamic ileus.  (R. at 260).  A small amount of free air was visualized on the upright film in the right upper quadrant, which may have been a normal result of abdominal surgery.  (Id.).  By the date of discharge, Campbell was tolerating a regular diet without difficulty, and his pain was well-controlled on oral pain medication.  (R. at 258).  He was instructed to continue a soft regular diet as tolerated, and he was allowed to return to regular activity.  (Id.).  On November 7, 2005, Campbell sought treatment for acute left-side abdominal tenderness and nausea.  (R. at 259). He was instructed to refrain from food for two days and restricted to liquids.  (Id.).

## B.  Additional Evidence

On September 22, 2006, Dr. Dilawari provided the following letter to the Appeals Council:

> Alfred Campbell has been a longstanding patient of mine since October 5, 1998 at which time he was treated for peptic ulcer disease.  He was status post gastrectomy for gastric carcinoma and received adjuvant chemotherapy. This persisted.  The patient then began to suffer from chronic gastric reflux.  He also suffered from gastric

ulcers and episodes of nausea and vomiting.

He was most recently seen in my office in January of 2006 due to the fact that he had Nissen fundoplication and hiatal hernia repair.

Due to all of these issues, this patient has been unable to work, even though he has reported numerous attempts at job applications. We have been advised by his attorneys that SSA has denied his benefits, therefore, we would like to appeal on the patient's behalf to reinstate his disability benefits due to the fact that this patient is unable to work because of his numerous surgeries and the side effects from his surgeries. . . .

(R. at 305).

## C.  Disability Cessation

On July 2, 2003, Dr. George W. Bounds, Tennessee Disability Determination Services Medical Consultant, completed an Analysis of Medical Improvement Issues. (R. at 198-99). He found that at the comparison point decision ("CPD"), Campbell had been diagnosed with stomach cancer that involved the regional lymph nodes. (R. at 198). At the current time, he had resumed normal activities, he had no complications from his subtotal gastrectomy, and his stomach cancer had not recurred. (Id.). Dr. Bounds found that Campbell's current medical conditions were non-severe and that significant medical improvement had occurred. (R. at 198-99).

On October 8, 2003, Dr. James P. Lester, Tennessee Disability Determination Services Medical Consultant, completed an analysis of Campbell's case. (R. at 208). He found that Campbell's physical impairments were not severe, either singly or in combination.

(<u>Id.</u>).  At the CPD, he had stomach cancer with metastasis to two out of five lymph nodes and a gastrectomy.  (<u>Id.</u>).  At the current time, he had no recurrence of cancer, no complications from the gastrectomy, elevated PSA but no new malignancy, and a cholecystectomy secondary to cholelithiasis with no complications. (<u>Id.</u>).

## D.  Disability Hearing

On April 26, 2004, a hearing was held before Disability Hearing Officer Kay Patterson to determine whether Campbell's health had improved and he was able to work.  (R. at 44-53).  She found that Campbell was not engaged in substantial gainful activity and that his impairments did not meet or equal any listed impairments.  (R. at 49).  She also found that there had been medical improvement of Campbell's condition since the CPD that was related to his ability to do work.  (R. at 50).  Specifically, Patterson found that Campbell could not work at the time of the CPD, but presently he could perform light exertional work.  (<u>Id.</u>).  She also found that Campbell had a severe impairment because his impairment had more than a minimal effect on his ability to do work.  (R. at 51).  Patterson noted that Campbell had the residual functional capacity ("RFC") for light exertional work, including the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight-hour work day, and sit for six hours in an eight-

hour work day.  (_Id._).  Patterson found that Campbell had no past relevant work, twelve years of education, and was closely approaching advanced age.  (R. at 52).  Patterson noted that, based on his age, education, and RFC, Campbell could perform work as a store laborer, laundry worker, work ticket distributor, cuff folder, cleaner or housekeeper, or silver wrapper.  (R. at 53). Patterson also made the following findings:

> Claimant was awarded benefits for malignant neoplasm of the stomach which met 13.16B Listing requirements. Benefits were ceased 7/03.  It was determined that his condition had improved since the comparison point decision (CPD) date of 4/20/01 and that he no longer had a severe impairment.  He did not undergo radiation or chemotherapy.  He had a history of chronic reflux since surgery, and multiple episodes of emesis which occurs 2-3 times a month.  He subsequently underwent a colonoscopy with polypectomy due to hemorrhoids.  The severity of his condition met 13.16B Listing requirements.

> At the CPD, the claimant had been diagnosed with gastric carcinoma with some superficial invasion.  He also had positive lymph nodes including 2 of 5 that were positive. He was symptomatic for epigastric pain, nausea, vomiting, weight loss, and dyspepsia that was getting progressively worse.  He underwent a subtotal gastrectomy with a B2 anastomosis. . . .

> Claimant testified at the hearing he continues to have difficulties related to stomach cancer.  He has gastric reflux that causes bile to come up through his nose.  He still has nausea, vomiting, difficulty holding his bowels, decreased energy, fatigue, difficulty sleeping, and pain.  He is unable to do the things he once was able to do because of residuals from stomach cancer.

> The hearing officer observed that the claimant presented subdued in presentation with decreased energy.  There were no observable indications of significant physical difficulties detected.  He complained of residuals related to S/P gastrectomy and gastric reflux, a decline in his daily activities, and decreased energy.  It is

noted that the evidence shows claimant experiences
chronic abdominal pain related to small bowel
obstruction, and elevated laboratory values. He has bile
that is excreted via his nose, and fatigue. Although he
continues to have difficulties the available evidence
does not support a finding of disability.

An analysis of the total available evidence establishes
that the claimant retains the residual functional
capacity to occasionally lift/carry twenty pounds,
frequently ten pounds, stand/walk six hours in an eight
hour work day, and sit for six hours in an eight hour
work day. His impairment is short of the Listing
requirements. . . .

(R. at 46-47). Patterson found that Campbell was no longer

disabled. (R. at 48).

## E. Disability Determinations

Michael Taylor, a disability examiner, and Dr. Dan S. Sanders

completed Campbell's Cessation of Disability Determination on July

11, 2003.[1]  (R. at 35-36). They found that Campbell had a primary

diagnosis of status post malignant neoplasm of stomach. (R. at

35). They also found that Campbell's hospital reports indicated

that his stomach cancer had not recurred or become widespread. (R.

at 36). Additionally, they found that Campbell's medical records

did not reveal any complications from bile reflux or his surgeries

that would be disabling. (Id.). They determined that because his

health had improved, he was no longer disabled. (Id.).

_____

[1]Kay Patterson also completed a Cessation of Disability
Determination on August 6, 2004. (R. at 37). She diagnosed
Campbell with malignant neoplasm of stomach, gastritis, duodenitis,
but the remainder of her findings were not included in the record.
(Id.).

## F.  Administrative Hearing

Campbell appeared *pro se* at a hearing before ALJ Zisook in Memphis, Tennessee, on August 2, 2005.  (R. at 306-09).  The ALJ explained Campbell's right to be represented at the hearing, and Campbell decided to obtain representation.  (R. at 308).  The ALJ closed the hearing and postponed the matter to provide time for Campbell to retain an attorney.  (Id.).

A second hearing was held October 12, 2005, and Campbell was represented by Dedrick Brittenum.  (R. at 310-34).  Campbell testified that he was fifty-four years old and had obtained his GED.  (R. at 313).  He stated that he lived with his son.  (Id.). Campbell stated that he had no means of income other than his disability benefits.  (R. at 313-14).  Campbell also testified that his last job was at Illinois Central Railroad, where he worked as a carbon mechanic.  (R. at 314).  He stated that the job required him to do some heavy lifting, including moving up to a ton of weight with several other people.  (R. at 314-15).  Campbell testified that he held that job from 1977 until 1997.  (Id.).

Campbell stated that he could no longer work because he had had surgeries to remove his gallbladder, his prostate due to prostate cancer, and seventy-five percent of his stomach due to stomach cancer.  (R. at 315-16).  He stated that he continued to have problems such as acid reflux and bowel reflux.  (R. at 315). He stated that his esophagus had eroded and he frequently became

weak and dizzy. (Id.). In addition, he stated that he often passed blood in his stool, and he sometimes spontaneously vomited. (Id.). Campbell testified that he had been throwing up the day before the hearing and that he felt weak. (Id.). He also testified that Dr. Dilawari was going to remove the rest of his stomach on October 27, 2005 to prevent further cancer development and stop the acid reflux. (R. at 316). Campbell further stated that because of his stomach problems, he had trouble eating and he normally tried to drink only water and eat only fruit because meats and certain vegetables made him sick to the point where he could barely function. (Id.). He stated that his weight dropped from 190 to 146 pounds. (Id.). He also stated that he experienced chronic pain from his prostate surgery and pain in his joints. (Id.). Additionally, he stated that he suffered from insomnia due to his pain and had visited a sleep lab. (R. at 317). He stated that his pain ran from his arms into his hands. (Id.). He said that Dr. Marcia Bradford was supposed to send him to a specialist but had not. (Id.).

Campbell testified that he had used cocaine since being released from prison, but he had quit after his parole officer sent him to a substance abuse program. (R. at 317). Campbell stated that he spent his days reading, walking, and going through his treatment. (Id.). He also stated that he had trouble focusing on what he was doing. (R. at 318). Campbell testified that he

could bathe and dress himself and that he did not have any problems sitting or standing. (Id.). He did state, however, that he sometimes had trouble walking because of his prostate surgery, which caused his muscles to be stiff. (Id.). He also stated that he did not have any problems that would prevent him from lifting, although his doctor had told him to wait a year or two after his prostate surgery before lifting anything heavy. (R. at 318-19). Campbell stated that he sometimes drove and that he would be able to shop if he could afford it. (R. at 319). He stated that he did not have any physical problems that would prevent him from working at a fast food restaurant. (R. at 320).

Upon examination by his attorney, Campbell stated that he was diagnosed with stomach cancer in 1998 and that he had a cancerous tumor in his stomach. (R. at 321). He stated that it had taken him about eighteen months to recover from his stomach surgery, although he did not think that he had ever fully recuperated. (Id.). Campbell stated that he had been under a doctor's care continuously since 1998. (R. at 322). He also stated that since 1998 he had been under the care of Dr. Dilawari for his stomach cancer. (R. at 323). He stated that initially he saw Dr. Dilawari regularly, but now he sees him about once or twice a year. (Id.). Campbell testified that Dr. Dilawari had stated that the progress of his stomach cancer looked good because he had no positive lymph nodes. (Id.). Campbell reported that Dr. Dilawari had diagnosed

him with acid reflux and bowel reflux in April of 2005. (R. at 323-24). Campbell stated that he had been experiencing bowel reflux since his surgery, and it caused him to get weak and "start throwing up my bowels." (Id.). He also stated that the bowel reflux caused him to be weak and to suddenly vomit yellow puss and fluids until he started gagging and nothing else would come up. (R. at 324). Campbell testified that his last attack of bowel reflux had been the previous day. (R. at 325). He stated that he experienced attacks about once a month, and they were becoming more frequent. (Id.). He stated that he also became dizzy, unsteady, and nauseous, and he passed blood in his stool. (Id.). Campbell testified that he did not think he would be able to work because he became too weak and irritated and because his condition affected him mentally. (R. at 326). He stated that if he had a dizzy spell at work, he would have to sit down or leave. (Id.).

Campbell testified that he had previously taken several clinical trial medications to treat his bowel reflux that had made him sick. (R. at 327). He stated that when he slept, the reflux would sometimes come up through his nose and throat, which burned and caused him to gag. (Id.). Campbell stated that Dr. Dilawari had found that Campbell's medications were not working, which required the removal of the rest of Campbell's stomach. (Id.). He testified that he went to his doctor to monitor his prostate cancer every three months. (R. at 329). He also stated that his doctor

found that his prostate condition was "looking good." (<u>Id.</u>). Campbell indicated that he thought that if his October 27 stomach removal surgery was successful, he could get back on his feet. (<u>Id.</u>).

Campbell testified that he loves railroad work and would love to go back to work. (R. at 331). He stated that when he was laid off from his job, he traveled to Africa to do political work. (<u>Id.</u>). He stated that because of his condition, he could no longer do manual labor. (R. at 332). He testified that he was trying to learn how to use a computer but that he could not be a productive worker in any task in his current condition. (<u>Id.</u>). He also stated that he hoped to become a productive worker again after his stomach surgery and that he hoped he could continue to receive disability benefits until he became healthy again. (R. at 332-33). Finally, he testified that he went to the Med for his PSA readings and that he had received a prescription but he could not afford to fill it. (R. at 334).

## G. The ALJ's Decision

The ALJ issued his decision denying Campbell's claim on May 10, 2006. (R. at 11-18). To determine whether Campbell continued to be disabled, the ALJ applied the sequential analysis under 20 C.F.R. § 416.994(b)(5).[2] (R. at 14-15). The ALJ found that, as of

---

[2]Continued entitlement to SSI benefits is determined by a sequential analysis set forth in the Social Security Regulations that may involve up to seven steps. 20 C.F.R. § 416.994(b)(5).

July 31, 2003, Campbell did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4 (the "Listings"). (R. at 16). The ALJ noted that the record did not show any recurrence of stomach cancer after Campbell's surgery in 1998, and as such his impairment no longer met the criteria of Listing 13.16B. (Id.).

The ALJ then determined that medical improvement had occurred as of July 31, 2003. (R. at 16). He found that Campbell's stomach cancer had not recurred, he had a normal physical examination in June of 2003, and Campbell stated that he felt "relatively well" at that time. (R. at 16-17). Additionally, the ALJ noted that an esophagogastroduodenoscopy performed in March of 2005 showed gastritis and gastroesophageal reflux disease, but no evidence of cancer. (R. at 17). The ALJ also noted that Campbell underwent gallbladder surgery in December of 2002 and that he was admitted to the hospital in May of 2003 for a small bowel obstruction. (Id.). The ALJ found, however, that Campbell had removed his nasogastric tube himself and demanded to leave after his abdominal distention had resolved. (Id.). Campbell had also had surgery for prostate cancer in December of 2003, but his lymph nodes and margins were negative for cancer, he did not require chemotherapy or radiation, and there was no evidence of cancer recurrence. (Id.). Campbell had also undergone hiatal hernia repair in November of 2005.

(Id.).  Finally, the ALJ noted that Campbell had a completely benign physical examination on April 13, 2004.  (Id.).

Next, the ALJ found that Campbell's medical improvement related to his ability to work because he no longer had an impairment or combination of impairments that met or medically equaled a Listing.  (R. at 17).  Additionally, he found that as of July 31, 2003, Campbell's impairment did not cause more than a minimal impact on his ability to perform basic work activities. (Id.).  Thus, the ALJ found that Campbell no longer had a severe impairment.  (Id.).  The ALJ stated that he considered all of Campbell's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, pursuant to 20 C.F.R. § 416.929 and SSRs 96-4p and 96-7p, as well as opinion evidence, pursuant to 20 C.F.R. § 416.927 and SSRs 96-2p, 96-5p, and 96-6p.  (R. at 18). The ALJ also stated that he considered the seven factors set forth under 20 C.F.R. § 416.929 for evaluating a claimant's subjective symptoms.[3]  (Id.).

---

[3]The seven factors to be considered when examining a claimant's subjective symptoms include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of

ALJ Zisook found that Campbell lived alone and was capable of performing personal hygiene and grooming, preparing meals, driving, and shopping for groceries. (R. at 18). Additionally, he found that Campbell told Dr. Pallera that his hobbies included fishing and exercising. (<u>Id.</u>). Campbell also stated that he spent his time reading the Koran, attending daily church services, walking, and performing household chores. (<u>Id.</u>). Campbell claimed that he experienced abdominal pain, chronic joint pain, gastroesophageal reflux disease, prostate cancer, weight loss, and that eating caused abdominal discomfort. (<u>Id.</u>). Campbell also reported that his prescribed medications caused diarrhea, drowsiness, and itching. (<u>Id.</u>). Campbell had also stated that he had some problems walking but no problems lifting, standing, or sitting. (<u>Id.</u>). Finally, he indicated that he was no longer able to do things that he formerly was capable of doing. (<u>Id.</u>).

---

any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

The ALJ found that Campbell's medically determinable impairment could have reasonably been expected to produce the alleged symptoms but that Campbell's statements concerning the intensity, duration, and limiting effects of his symptoms were not entirely credible. (R. at 18). The ALJ concluded that the medical evidence did not support Campbell's claims that he must have the rest of his stomach removed or that bile excretes via his nose. (R. at 19). He also found that Campbell reported being unable to do things he formerly did, but he continued to fish, exercise, and drive. (Id.). Moreover, Campbell claimed to have problems walking, but the ALJ found that the medical records showed normal gait, intact cranial nerves, and a normal physical examination in April of 2004. (Id.). The ALJ also noted that Campbell's daily activities indicated that he could perform basic work activities. (Id.). In addition, the ALJ adopted the opinion of Dr. James Lester, a non-examining state agency consultant, who found that Campbell had no severe physical impairments. (Id.). Therefore, the ALJ determined that Campbell no longer had a severe impairment and that his disability ended as of July 31, 2003.[4] (R. at 20).

## II. PROPOSED CONCLUSIONS OF LAW

In his appeal, Campbell argues that the Commissioner erred in (1) failing to properly apply the "medical improvement" standard

---

[4]Based on his conclusion at step five that Campbell did not have a severe impairment or combination of impairments, the ALJ did not proceed to steps six and seven of the sequential analysis.

prior to concluding that Campbell's medical condition had improved;
(2) finding that the medical evidence failed to demonstrate that
Campbell had any severe impairments; and (3) finding that Campbell
was not credible.

## A.   Standard of Review

Judicial review of the Commissioner's decision is limited to
whether there is substantial evidence to support the decision, 42
U.S.C. § 405(g); Drummond v. Comm'r of Soc. Sec., 126 F.3d 837, 840
(6th Cir. 1997), and whether the correct legal standards were
applied.  Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211,
213 (6th Cir. 1986).  When the record contains substantial evidence
to support the Commissioner's decision, the decision must be
affirmed.  Stanley v. Sec'y of Health & Human Servs., 39 F.3d 115,
117 (6th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389,
401 (1971)).  "Substantial evidence" is "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion."  Richardson, 402 U.S. at 401 (quoting Consol. Edison
Co. v. NLRB, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence exists, the
reviewing court must examine the evidence in the record taken as a
whole and must take into account whatever in the record fairly
detracts from its weight.  Abbott v. Sullivan, 905 F.2d 918, 923
(6th Cir. 1990).  When substantial evidence supports the
Commissioner's determination, it is conclusive, even if substantial

evidence also supports the opposite conclusion. <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994). Similarly, the court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994).

Benefits may only be discontinued if (1) there is substantial evidence to support a finding of medical improvement related to an individual's ability to work, and (2) the individual is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(a); <u>Cogswell v. Barnhart</u>, No. 04-171-P-S, 2005 WL 767171, at *1 (D. Me. March 14, 2005). Medical improvement is any decrease in the medical severity of an impairment *which was present at the time of the most recent favorable medical decision that a claimant was disabled or continued to be disabled*. 20 C.F.R. § 404.1594(b)(1) (emphasis added). To find that there has been medical improvement, "the Commissioner must compare the prior and current medical evidence to determine whether there have been any such changes in the signs, symptoms and laboratory findings associated with the claimant's impairment." <u>Rice v. Chater</u>, 86 F.3d 1, 2 (1st Cir. 1996); 20 C.F.R. § 404.1594(b)(1). Changed symptoms, signs, and laboratory findings "are the only relevant indicia of medical improvement under the regulations." <u>Rice</u>, 86 F.3d at 2.

The second part of the evaluation, whether the individual is

now able to engage in substantial gainful activity, involves many of the same standards applicable to initial disability determinations. 20 C.F.R. § 404.1594(b)(5), (f)(7); see Kennedy v. Astrue, No. 06-6582, 2007 WL 2669153, at *4 (6th Cir. Sept. 7, 2007). In a determination of cessation of benefits, however, the burden of proof lies with the Commissioner, not the claimant. Kennedy, 2007 WL 2669153, at *4.

**B.   Medical Improvement Standard**

The court submits that the ALJ applied the correct legal standards in determining that medical improvements had occurred and further submits that substantial evidence supports the ALJ's determination. 20 C.F.R. § 416.994(b)(2)(iv) provides as follows:

> (A) Previous impairment met or equaled listings. If our recent favorable decision was based on the fact that your impairment(s) at the time met or equaled the severity contemplated by the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, an assessment of your residual functional capacity would not have been made. If medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to your ability to work. . . . If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to your ability to work. We must, of course, also establish that you can currently engage in substantial gainful activity before finding that your disability has ended.

Id. In addition, Listing § 13.16B states as follows:

> 13.16 Esophagus or stomach. B. Carcinoma or sarcoma of the stomach, as described in 1 or 2:
>
>     1. In operable, unresectable, extending to

surrounding structures, or recurrent.

2. With metastases to or beyond the regional lymph nodes.

*Id.* Here, the court submits that substantial evidence supports the ALJ's finding that medical improvements had occurred and that the severity of Campbell's prior impairments no longer met or equaled the same listing used to make the Commissioner's most recent favorable decision (i.e. cancer of the stomach under Listing § 13.16B). First, regarding the ALJ's finding that medical improvements had occurred relating to Campbell's stomach cancer, the court submits that the medical records sufficiently support the ALJ's findings. Evidence from the West Clinic demonstrated that Campbell did not have any stomach cancer recurrence after his surgery in November of 1998 and that he did not require any chemotherapy or radiation therapy. In December of 2001, Campbell was reevaluated for gastric cancer, dyspepsia, and hematochezia at Delta. He had a normal physical examination, and the diagnostic impression was hematochezia, rule out colon cancer. CT scans of Campbell's abdomen and pelvis showed no abnormality or pathology. When Campbell was admitted to Methodist from December 26, 2001, until December 27, 2001, for hematochezia, abdominal pain, nausea and vomiting, weakness, and rectal bleeding, the records indicated that he was not taking his prescribed medications, his physical examination was normal, x-rays of his abdomen showed no abnormalities, and CT scans of the abdomen and pelvis revealed no

pathology.  On December 27, 2001, a gallbladder ultrasound was performed and the findings were acoustical densities within the gallbladder consistent with small gallstones, but no other abnormalities were identified.  The diagnostic impression was cholelithiasis, and an x-ray showed no abnormalities aside from a tiny, nonspecific calcification in the pelvis.

In January of 2002, a physical examination of Campbell was normal, and a gastrointestinal endoscopy and biopsy performed to assess Campbell's nausea and vomiting revealed only mild esophagitis with bilious material, erythematous mucosa without ulceration in his stomach, and normal mucosa in his duodenum.  A tissue sample from Campbell's stomach was negative for H. pylori, there was histologically normal duodenal mucosa, and no malignancy was identified.

In September of 2002, Campbell was seen for gallstones and acid reflux, and a CT scan of Campbell's abdomen and pelvis showed no evidence of residual tumor or adenopathy.  During this time Campbell was seen at Delta for diarrhea caused by his medication and four to five bowel movements per day, but his physical examination was normal, he was diagnosed with GERD, and he was treated with medication and released.

In December of 2002, a physical examination showed that his abdomen was soft with a well-healed midline surgical incision without nodules or hernia, positive bowel sounds, extreme

tenderness to light palpation throughout with no peritoneal signs, and that his systems were otherwise normal. Dr. Silva noted that Campbell was remarkable in that he was 4.5 years post subtotal gastrectomy for node positive gastric cancer. During this time, an open cholecystectomy with intraoperative cholangiogram was performed, and his gallbladder was removed. However, the medical records indicated that there were no nodes in the porta hepatis, no evidence of recurrence of gastric cancer, the common bile duct appeared normal in size without evidence of extrinsic compression, and there was no evidence of filling defects or evidence of neoplasm. By the time that Campbell was seen by Dr. Silva for a post-operative follow-up, Campbell had resumed normal activities with no limitations, he was eating well without any nausea or vomiting, he denied any difficulty with pain, and Dr. Silva found that Campbell could resume his normal activities and exercise routine. Dr. Silva found that Campbell had no evidence of recurrent gastric tumor. A physical examination in June of 2003 revealed that Plaintiff had a non-distended abdomen with normative bowel sounds without evidence of abdominal masses. A whole body scan performed in September of 2003 showed no evidence of metastatic disease. In March of 2004, Dr. Silva examined Campbell and indicated that the exam was completely unremarkable and that a laparotomy, performed four months earlier, showed no evidence of recurrent disease. Although in July of 2005, Campbell was advised

to undergo a total gastrectomy, he decided not to go through with the surgery.

Second, regarding the ALJ's finding that Campbell's impairment no longer met the criteria of Listing 13.16B, Campbell argues that the ALJ focused too much on Campbell's gastric cancer and failed to adequately consider Campbell's other impairments. However, 20 C.F.R. § 416.994(b)(2)(iv) provides that the relevant inquiry for the ALJ is whether the severity of the *prior impairment(s)* no longer meets or equals the *same listing section* used to make the most recent favorable decision. As discussed above, and as set forth in the ALJ's written decision, the medical evidence shows that Campbell's prior impairment (stomach cancer) no longer meets or equals Listing 13.16B, based on the surgery that successfully removed Campbell's stomach cancer and the lack of medical evidence to show that he continued to suffer from that impairment. Also, since Campbell experienced medical improvement to the degree that the requirement of the listing section was no longer met or equaled, pursuant to § 416.994(b)(2)(iv), the medical improvement was related to Campbell's ability to work.

## C. Severe Impairments

The court, however, submits that the ALJ's determination at step five – that Campbell no longer suffers from a severe impairment – is not supported by substantial evidence. Under step five, the ALJ must "determine whether *all [of claimaint's]* current

impairments in combination are severe" and "will consider *all [of claimant's] current impairments* and the impact of the combination of these impairments on [claimant's] ability to function." 20 C.F.R. § 416.994(b)(5)(v) (emphasis added). "An impairment can be considered as not severe . . . only if the impairment is a slight abnormality [that] has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." <u>Farris v. Sec'y of Health and Human Servs.</u>, 773 F.2d 85, 90 (6th Cir. 1985) (internal quotations omitted); <u>see also</u> <u>Guinn v. Comm'r of Soc. Sec.</u>, 2008 WL 1766785, at *4 (S.D. Ohio April 11, 2008). The severity determination is "a *de minimus* hurdle in the disability determination process," and its purpose is to "screen out claims that are totally groundless solely from a medical standpoint." <u>Childrey v. Chater</u>, No. 95-1353, 1996 WL 420265, at *1 (6th Cir. July 25, 1996) (internal quotations omitted). Based on Campbell's medically documented conditions described in the Proposed Findings of Fact, and given the *de minimis* standard under step five, it is submitted that the ALJ's finding that Campbell did not have a severe impairment is not supported by substantial evidence. The objective medical evidence demonstrates that Campbell was diagnosed with and treated for numerous impairments which, while not related to his stomach cancer, involved problems with chronic abdominal pain and reflux. For example, Campbell

received treatment for esophagitis and gastritis, small bowel obstruction, cholelithiasis, GERD, mild chronic cholecystitis, large esophageal hiatal hernia, and was hospitalized on multiple occasions in connection with his treatment. Also, Dr. Dilawari recommended a total gastrectomy and that his colon be rerouted to his esophagus. Moreover, Disability Hearing Officer Kay Patterson concluded that Campbell had a severe impairment. Finally, the court finds that the September 22, 2006 letter from Dr. Dilawari, while conclusory on certain points, at minimum demonstrates that Campbell's impairments have more than a minimal effect on his ability to do basic work activities. Therefore, the court submits that the ALJ's determination at step five is not supported by substantial evidence, and that the ALJ erred in not proceeding to steps six and seven of the sequential analysis.

### III.  RECOMMENDATION

For the reasons above, the court recommends that the Commissioner's decision be remanded for further proceedings consistent with this report and recommendation.[5]

---

[5]Campbell also argues in the present appeal that the ALJ erred in discrediting Campbell's testimony. In light of the court's recommendation that the case be remanded for further proceedings before the ALJ, the court need not address the credibility determinations at this time. It is assumed that the ALJ will conduct a new hearing and may make additional credibility determinations based on the testimony at that hearing.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

August 28, 2008
Date

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**